## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 30 2017, 6:39 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

APPELLANT PRO SE

James Strong
Greencastle, Indiana

ATTORNEY FOR APPELLEE

Katherine S. Brown
Brown & Somheil
Brazil, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

James Strong,

*Appellant-Movant,*

v.

Shandra Snowden,

*Appellee-Respondent*

August 30, 2017

Court of Appeals Case No.
67A04-1703-JP-633

Appeal from the Putnam Circuit Court

The Honorable Matthew L. Headley, Judge

Trial Court Cause No.
67C01-0308-JP-70

**Baker, Judge.**

[1] James Strong (Father) appeals the trial court's order denying his motion to modify parenting time and restricting the parenting time he was already exercising.[1] Father raises a number of issues, which we consolidate and restate as an argument that there is insufficient evidence supporting the trial court's ruling. Finding the evidence sufficient, we affirm.

## Facts

[2] Father and Shandra Snowden (Mother) have one child together: D.E., who was born in 2003 to the unmarried parents. Mother and Father are no longer in a romantic relationship and have not been so since the time of D.E.'s birth. Since D.E.'s birth, Mother has had primary legal and physical custody of the child and, for many years, Father exercised reasonable parenting time pursuant to guidelines put in place by the trial court.

[3] In December 2014, Father was exercising parenting time with D.E. every other Friday night until Monday morning and every Wednesday night until Thursday morning. Around that time, eleven-year-old D.E. brought a boy and another girl to Father's house while he was at work. Mother punished D.E., including grounding her for the remainder of the school year, suspending internet privileges, calling the boy's mother, and calling the mother of the girl who was with D.E. during the incident. Father's response has been to monitor all of

---

[1] His motion requested other relief as well, but the only portion of the ruling at issue in this appeal relates to the requested modification of parenting time.

D.E.'s text communications and social media posts, installing an app so he can monitor her cell phone, and generally being extremely rigid with her. Two and one-half years later, Father is still "very fixated" on the incident when the boy came to his house: "He still seems very fixated on, any time she, you know what's [sic] she's wearing, who's [sic] she's with. Very concerned about those kind of things. About her being sexy." Tr. Vol. II p. 175.

[4] As a result of the incident and Father's response to it, among other things, the relationship between D.E. and Father began to deteriorate dramatically. In June 2015, Father enrolled D.E. in counseling to try to repair their relationship. D.E. saw a therapist for a period of time who retired in April 2016; at that time, Dana Glessner took over the child's therapy.

[5] On February 12, 2016, Father filed a petition to, among other things, modify the parties' parenting time structure. On March 31, 2016, Mother filed a motion for an emergency hearing regarding parenting time. It had come to light that Father had pinched or touched a bra that D.E. was wearing. The Department of Child Services became involved but eventually unsubstantiated allegations of inappropriate sexual contact. Father describes the encounter as follows:

> . . . Father noticed that [D.E.'s] bra looked inappropriate for her age. Father became upset, because he had been having to address the way that D.E. was dressing a lot, prior to that. The bra had a lot of black lace and straps, and looked more like lingerie, and appeared to be a push up bra. . . . Father pinched the padding of the bra to see if it was a push-up bra. Father never touched D.E.'s breasts.

Appellant's Br. p. 11. Because of this encounter, the trial court held an emergency hearing and conducted an in camera interview with D.E.; the trial court subsequently restricted Father's parenting time to public places with no overnights until the parties participated in family counseling.

[6] In Glessner's words, D.E.'s mental health is negatively impacted by her relationship with Father in the following ways:

- When D.E. is at Father's house, she felt cut off from her friends because she would not bring her phone to his house. He also refused to let her participate in social activities, which Glessner believed was limiting D.E.'s emotional and social development and was too restrictive. Tr. Vol. II p. 164. D.E. has significant concerns and anxiety because Father will not "allow her to go to those activities that she loves." *Id.* at 166.
- Spending overnights at Father's house is "a huge stressor for her that really takes her away from things that she should be focusing on. Takes a lot of mental, emotional energy to her for deal [sic] with things with Dad and it's, you know it takes a lot of recovery time for her after she's you know had some of those visits." *Id.* at 167.
- D.E. told Glessner that "ninety nine percent of sources of her stress and anxiety and depression was from her Dad." *Id.* at 171.
- Father has called D.E. a "slut" and a "baby" and "blames her for getting upset when he calls her names[.]" *Id.* at 174.
- Father has indicated that if he found out D.E. was sexually active, he would kill himself. *Id.*

Father attended three counseling sessions with D.E. and Glessner, but stopped attending after a June 9, 2016, session because he did not like what Glessner was telling him. Father later returned to counseling in November 22, 2016, and resumed overnights with D.E. in December 2016.

Glessner has diagnosed D.E. with anxiety and depression, the vast majority of which is attributable to her relationship with Father. While D.E. had been making progress in terms of her mental health leading up to December 2016, her anxiety and depression returned and worsened almost immediately after resuming overnights with Father. D.E.'s struggles now include physical symptoms, including vomiting before visits with Father, sleeplessness at Father's home, increased crying, and difficulty concentrating.

Glessner has made a number of suggestions to Father about ways he could improve his relationship with D.E., but he has not been receptive to those suggestions. Glessner believes that Father needs to learn to be warm, encouraging, and supportive, and relax his rigid rules so that D.E. can exercise an appropriate amount of independence for her age. Glessner recommended that until Father and D.E. made progress in their relationship, overnights should be suspended because of the risk of harm to D.E.'s emotional and mental well-being.

The trial court held an evidentiary hearing on Father's petition to modify parenting time on January 27, 2017. On March 1, 2017, the trial court denied Father's petition. In relevant part, the trial court found and held as follows:

> 6. . . . Glessner testified at the hearing that she had previously believed that the child's mental and emotional health will be damaged by being required to spend time with her father. . . . She further stated that Respondent Father would not listen to the child's concerns and would simply state that he did nothing wrong. . . .

***

8. . . . Glessner has . . . expressed concerns that Respondent Father is doing many of the same things that caused her to believe that spending time with her father is damaging to [D.E.'s] mental and emotional health. Included in those concerns are that the Respondent father makes accusations about the child being dressed inappropriately, that the child cannot be trusted, grilling her about innocent posts she makes on social media, and his controlling nature in general that includes not allowing her to participate in extra-curricular activities during his parenting time. That Respondent father's handling of such issues upsets the child and causes her feelings of depression and anxiety, to the point that on one visit, she became physically sick before having to go to her Father's home. Father's controlling nature seems to go beyond healthy parenting and to the level of extreme misery for the child. Her emotional development and well-being are severely hampered by Father's actions towards her.

9. . . . Glessner believes that the parenting time should be scaled back and that overnights be suspended, until such time that real progress is made by Father in counseling. . . . Ms. Glessner opines that mother has been doing the right things for the child, and the Court finds nothing to refute that.

10. . . . Respondent Father's intentions may be genuine but his techniques continually strain his relationship and any feeling of trust that the two of them can have. Father seems to ignore the fact that the child is growing up and wants to spend time with friends, as he previously stated, that his time is exactly that, his time with the child and not to take her places or let her have time with friends over.

11. . . . Mother states that it is so bad that the child does not want to see Father at all. However, mother does continue to encourage the child to see her father.

\*\*\*

13. . . . The child wants to continue to live with Mother and does not want to spend the night at Father's home. . . .

\*\*\*

Judgement

1. . . . The Court concludes that the mental health of the child is at risk given the testimony of mother, father, and therapist.

2. The Court concludes that I.C. 31-17-4-2 and the interpretation of *Patton v. Patton*, 48 N.E.3d 17 (Ind. Ct. App. 2015), allows the Court that continuing overnight visitation with the child and [F]ather is negatively affecting the child's mental and emotional development. Father shall be entitled to parenting time with the child every other Saturday from 8:00 a.m. until 5:00 p.m., and on [a] mid-week day for up to four (4) hours. . . .

3. The Court concludes and Orders that the parties shall continue family counseling/therapy with the ultimate goal that Father have [parenting time pursuant to the] Indiana Parenting Time Guidelines[;] how long that will take or if that ever occurs, will be determined by how the parties progress through counseling. . . . [T]he Court believes the best person to determine how they are progressing is the counselor. Overnights shall resume when the counselor

deems that Father and child have a positive relationship and that overnights would no longer negatively affect the child's mental and emotional development. The frequency and duration shall be left to the discretion of the counselor. . . . The Court concludes that father most likely needs to come to grips with the reality that the child is now moving into young adulthood. She must be allowed some freedom. It is a delicate balance between child freedom and parental responsibility, however, through work with the counselor, this Court believes that father will learn to understand how/what "normal" teenagers' activities consist of. . . .

Appealed Order p. 2-8. Father now appeals.

# Discussion and Decision

[10] Father argues that the trial court erred by denying his petition to modify parenting time and by restricting the parenting time he was already exercising. Indiana "has long recognized that the rights of parents to visit their children is a precious privilege that should be enjoyed by noncustodial parents." *Duncan v. Duncan*, 843 N.E.2d 966, 969 (Ind. Ct. App. 2006). Consequently, a noncustodial parent is generally entitled to reasonable visitation rights. *Patton v. Patton*, 48 N.E.3d 17, 21 (Ind. Ct. App. 2015).

[11] When reviewing a trial court's resolution of a parenting time matter, we will reverse only if the trial court made a manifest error. *Id.* If the record reveals a rational basis supporting the trial court's determination, no error occurred. *Id.* In conducting our review, we will neither reweigh the evidence nor reassess witness credibility. *Id.* We will afford considerable deference to the trial court's

findings in family law matters because "the trial court is in the best position to become acquainted with the relationship between parents and their children." *D.B. v. M.B.V.*, 913 N.E.2d 1271, 1274 (Ind. Ct. App. 2009).

[12] Indiana Code section 31-17-4-2 provides that a trial court

> may modify an order granting or denying parenting time rights whenever modification would serve the best interests of the child. However, the court shall not restrict a parent's parenting time rights unless the court finds that the parenting time might endanger the child's physical health or significantly impair the child's emotional development.

Our Supreme Court has noted that despite the statute's use of the word "might," the statute "requires evidence establishing that visitation 'would' (not 'might') endanger or impair the physical or mental health of the child." *Perkinson v. Perkinson*, 989 N.E.2d 758, 763 (Ind. 2013) (quoting *Stewart v. Stewart*, 521 N.E.2d 956, 960 n.3 (Ind. Ct. App. 1988)).

[13] Here, there is ample evidence in the record supporting the trial court's conclusions that if Father's parenting time with D.E. were not restricted, her mental and/or emotional health would be significantly impaired. Specifically, D.E.'s therapist testified that D.E. suffers from anxiety and depression stemming almost entirely from time spent with Father, particularly times when she has to spend the night at his home. D.E. had been improving to a point that overnight visits were resumed, and very quickly her mental and emotional well-being deteriorated significantly. Before, during, and after her overnight visits with Father, D.E. experienced vomiting, difficulty concentrating,

increased crying, and sleeplessness. Father called D.E. names and got angry when that behavior upset her; he also threatened to commit suicide if she became sexually active. Father was either unable or unwilling to work with D.E.'s therapist to ameliorate the situation and begin to repair his relationship with his daughter. This evidence readily supports the trial court's conclusions that granting Father's petition to modify parenting time would not have been in D.E.'s best interests and that continuing to allow him to exercise overnight visitation with her would significantly impair her mental and/or emotional well-being. Father's arguments to the contrary largely amount to a request that we reweigh evidence and reassess witness credibility—a request we decline.[2]

[14] Father contends that the trial court erroneously relied on *Patton* in restricting his parenting time. In *Patton*, we affirmed the trial court's decision to continue to require supervised parenting time until the non-custodial parent and child attended joint counseling and obtained the counselor's written recommendation for unsupervised parenting time. 48 N.E.3d at 22. Father is correct that the underlying reason for the parenting time restriction is different in *Patton* as compared to the case at hand, but both cases included evidence from a counselor/evaluator that the requested parenting time created a risk to the minor child's emotional development. *Id.* at 20, 22. The mere fact that the

---

[2] Father highlights many of the trial court's findings of fact, contending that the findings are erroneous. His argument in this regard, however, consists of directing our attention to evidence in the record supporting his position rather than the trial court's findings. This is an inappropriate request that we reweigh evidence, which we decline to do. The testimony of Glessner and Mother readily supports the trial court's findings of fact.

factual situations are different does not render *Patton* inapposite. Indeed, the trial court in this case took a proverbial page from *Patton*'s book by providing a clear road map for Father to remove the parenting time restriction. As in *Patton*, we find here that "the trial court took a thoughtful approach to the visitation issue and has struck a balance that adequately addresses the concerns of all, while still providing Father with opportunities for more rewarding parenting time with [the minor child], immediately and in the future." *Id.* at 22. We find no error in the trial court's reliance on *Patton*.

[15] Finally, Father argues that the trial court erred by failing to address his contention that Mother has interfered in his relationship with D.E. and has alienated the child from him. We disagree, inasmuch as the trial court's order explicitly noted that "mother has been doing the right things for the child" and that "mother does continue to encourage the child to see her father." Appealed Order p. 4. These findings implicitly refute Father's allegation that Mother has interfered in his relationship with D.E., and his arguments to the contrary amount to an improper request that we reweigh the evidence and reassess witness credibility.

[16] The judgment of the trial court is affirmed.

Bailey, J., and Altice, J., concur.